**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

FILED BY___HC___D.C.

JUL 1 1 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

RICHARD ARJUN KAUL, MD;
JANE DOE, JOHN DOE

v.                                                          CIVIL ACTION: NO.:

CHRISTOPHER J. CHRISTIE; KEVIN MURPHY                        COMPLAINT
JANE DOE; JOHN DOE (1-11)

# Contents

**Preliminary Statement** – Page 4

**Jurisdiction + Venue** – Page 5

**Parties** – Page 6

**Facts** – Page 7

**Legal Claims** – Page 23

42 U.S.C. § 1983 – CIVIL ACTION FOR DEPRIVATION OF RIGHTS – Page 23

COUNT ONE
AGAINST DEFENDANTS CHRISTIE/MURPHY
VIOLATION OF PLAINTIFF KAUL'S DUE PROCESS RIGHTS PURSUANT TO THE FIFTH, EIGHT AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION – Page 23

COUNT TWO
AGAINST DEFENDANTS CHRISTIE/MURPHY
VIOLATION OF PLAINTIFF KAUL'S RIGHT PURSUANT TO THE FOURTH AMENDMENT OF THE
UNITED STATES CONSTITUTION – Page 26

COUNT THREE
AGAINST DEFENDANTS CHRISTIE/MURPHY
42 U.S.C. § 1985 (3) – CONSPIRACY TO INTERFER WITH CIVIL RIGHTS – Page 28

**Relief** – Page 30

**Conclusion** – Page 31

# Preliminary Statement

1. This case, K11-15 of **The Kaul Cases**, details the ever-expanding and continually unsuccessful conspiracy to eliminate Plaintiff Kaul (jail-suicide/murder), in order to cause him to cease his prosecution of **The Kaul Cases** Defendants, a prosecution that will further expose their crimes and those of their co-conspirators.

2. Continuing to be a central cog in the conspiracy is Defendant Christie, whose profound concerns about the decimating effect that Plaintiff Kaul has had, and continues to have on his political path to the White House, have destabilized his mental fitness/political judgment, such that his schemes to eliminate Plaintiff Kaul have devolved into the conversion of unwitting rookie/other police officers into nothing but 'Nazi-esque' thugs.

3. K11-15 details a scheme of ongoing human/constitutional/civil rights violations, that constitute further conclusive evidence of **The Kaul Cases** claims, and specifically those of K11-14, claims that Plaintiff Kaul has been consistently asserting in the United States District Court since February 22, 2016.

4. The relief sought in K11-15 is of the same nature and form as that sought in K1, and involves not only relief specific to Plaintiff Kaul, but, and arguably as important, if not more, changes to the political and healthcare regulatory systems, including a **"Reformation of American Medical Boards" ("RAMBO")**.

5. Plaintiff Kaul, a citizen of India, respectfully advises this Court that the Indian Government and specifically the Office of PM Modi, have been made aware of the within pled facts/surrounding issues, and a copy of this Complaint has been transmitted to the relevant persons/consulates.

4

# Jurisdiction + Venue

6. <u>General</u>:

28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Kaul's Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.

28 U.S.C. § 1332(a) – The aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000).

7. <u>Personal</u>:

The Court has personal jurisdiction over all Defendants, as each Defendant has transacted business, maintained substantial contacts, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in New Jersey.

8. <u>Venue</u>:

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

# Parties

### 9. Plaintiff

RICHARD ARJUN KAUL, MD – 24 Washington Valley Road, Morristown, NJ 07960: 973 876 2877: DRRICHARDKAUL@GMAIL.COM **("PLAINTIFF KAUL")**

### 10. Defendants

CHRISTOPHER J. CHRISTIE – 2nd Floor, 36th Street Capital, Maple Avenue/Dehart Street, Morristown, NJ 07960 (**"DEFENDANT CHRISTIE"**).

OFFICER KEVIN MURPHY – MORRISTOWN POLICE DEPARTMENT, 200 SOUTH STREET MORRISTOWN, NJ 07963-4152 (**"DEFENDANT MURPHY"**)

# Facts

11. From 2002 to 2012, Plaintiff Kaul revolutionized the field of minimally invasive spine surgery by inventing and successfully performing the first percutaneous outpatient spinal fusion in February 2005 at the Market Street Surgical Center in Saddlebrook, New Jersey.

12. As a consequence of the invention/successful performance of this industry changing procedure, Plaintiff Kaul's professional and commercial success escalated exponentially, and his businesses generated immense wealth based on the superiority of his technique over those performed by his surgeon competitors, who did not possess the surgical skills to perform Plaintiff Kaul's percutaneous procedure.

13. Plaintiff Kaul's competitors, unable to compete with Plaintiff Kaul in the minimally invasive spine surgery market, and feeling threatened by his rapidly increasing professional/commercial/reputational success, commenced conspiring against him.

14. From 2005 to 2008, the conspiracy consisted of, amongst other things: (i) slandering Plaintiff Kaul's name with patients; (ii) instructing/coercing physicians in the community to not refer patients to Plaintiff Kaul; (iii) instructing/coercing hospitals to not grant Plaintiff Kaul admitting privileges; (iv) coercing medical device representatives to not provide Plaintiff Kaul the devices/material he required to conduct the percutaneous spinal fusions, by threatening to have members of their surgical societies refuse to use their products; (v) colluding with insurance companies in the generation of medical 'opinions' denying payment to Plaintiff Kaul for his rendering of clinical services.

15. In approximately 2008, Plaintiff Kaul's competitors, recognizing the failure of their prior tactics, did engage with **The Kaul Cases** Defendant, and about to then be the 2009 New Jersey Governor, Christie, in a quid pro quo scheme, in which bribes were funneled into *his* personal/business/political 'coffers' and other financial vehicles.

7

16. In exchange for the bribes, Defendant Christie abused state executive power and ordered his AG/OAL Judge/Medical Board to commence 'sham' legal proceedings to illegally suspend (2012) and then revoke (2014) Plaintiff Kaul's license.

17. The licensing proceedings in the New Jersey Office of Administrative Law (April 9 to June 28, 2013) were conducted illegally and involved corruption of the administrative law judge and **The Kaul Cases** Defendant, Jay Howard Solomon and at least **two hundred and seventy-eight (278) separate instances of evidential tampering/witness tampering/perjury/evidential omission** in the final report issued by **The Kaul Cases** Defendant, Jay Howard Solomon, on December 13, 2013.

18. In a period from approximately 2010 to late 2015, Defendant Christie abused the executive power of state and his influence from his tenure (2000-2008) as the US Attorney for the District of New Jersey, to have violated Plaintiff Kaul's human/constitutional rights in administrative/state/state-appellate/bankruptcy/district courts within the geographic boundaries of the State of New Jersey, the purpose being to eliminate or otherwise effectively terminate Plaintiff Kaul's existence.

19. The purpose of eliminating/otherwise terminating Plaintiff Kaul was to attempt to prevent him from exposing, through litigation, the crimes of **The Kaul Cases** Defendants.

20. On February 22, 2016, Plaintiff Kaul filed suit against Defendant Christie and others in the United States District Court (Kaul v Christie: 16-CV-02364) (K1), on charges of knowing/willful violations of RICO/Antitrust and violations of Plaintiff Kaul's human/constitutional rights.

21. In or around May 2016, Defendant Christie, in collusion and conspiracy with certain persons in the New Jersey Office of the Attorney General and the Mercer County Prosecutor's Office, willfully abused the power of state to file a knowingly false criminal indictment against Plaintiff Kaul, in retaliation for the filing of K1.

8

22. Defendant Christie and his co-conspirators concocted and schemed to use the US wires and apparatus of state to perpetrate a knowingly illegal fraud against Plaintiff Kaul in an attempt to intimidate/harass him into not prosecuting K1, in an effort to conceal the crimes/human rights violations committed against Plaintiff Kaul by himself and **The Kaul Cases** Defendants.

23. The knowingly false indictment claimed that Plaintiff Kaul had allegedly deprived the state of tax revenue.

24. Defendant Christie and his co-conspirators knew that their allegations were false, and that the perpetration of the fraud through the apparatus of state constituted the commission of the felonies of wire fraud/public corruption/perjury.

25. Defendant Christie and his co-conspirators knew that in their commission of the felonies of wire fraud/public corruption/perjury, they willfully and with malice deprived Plaintiff Kaul of his human/civil/constitutional rights.

26. Defendant Christie and his conspirators, despite cognizance of the illegality of their misconduct, did act with impunity, as they filed the indictment with Peter Warshaw, a state court judge appointed by Defendant Christie to the Trenton bench. Plaintiff Kaul sent Warshaw a letter, dated October 11, 2016, informing him of, amongst other things, the conflict of interest (**Exhibit 2**). Plaintiff Kaul received no response.

27. Under orders from Defendant Christie, a paper copy of the fraudulent tax indictment was transmitted via the US mail to Plaintiff Kaul's ex-residence in Bernardsville in or around May/June 2016.

28. In 2016, Plaintiff Kaul's ex-residence was occupied by his ex-wife and two (2) young children, who had lived in the house since 2003 with Plaintiff Kaul *until he relocated into* Manhattan in 2005, that being the last year of his residence.

9

29. Plaintiff Kaul's ex-wife never forwarded him the papers of Defendant Christie's fraudulent tax indictment.

30. At approximately 1:30 am on September 16, 2016, Plaintiff Kaul was arrested at his residence by eight armed officers from the Somerset County Sheriff's Office on a warrant for unpaid child support, pursuant to a case filed by Plaintiff Kaul's ex-wife with the child support probation department of the State of New Jersey.

31. Subsequent to the arrest, Plaintiff Kaul was taken to the Somerset County Jail where he was told by a child probation officer that unless he paid thirty thousand dollars ($30,000), he would not be released.

32. Plaintiff Kaul informed this individual that consequent to the illegal suspension (2012)/revocation (2014) and their legal sequelae, he had entered a state of poverty, and thus could not make any payments.

33. Plaintiff Kaul was then medically evaluated and found to have an excessively high blood pressure, but was nonetheless placed in a holding cell at approximately 3 am and at 7am he was transferred to a jail cell without having received any antihypertensive medications.

34. At approximately 9 am, Plaintiff Kaul's blood pressure was again measured and had increased, and so he was transferred to the medical unit within the jail, where he was placed on EKG, oxygen, and blood pressure monitoring, and had conducted a twelve (12) lead EKG.

35. Plaintiff Kaul remained handcuffed to the medical unit bed.

36. After several hours of intravenous therapy, nitroglycerin therapy and intravenous antihypertensives, Plaintiff Kaul's condition had not improved, and so he was transferred via to

Robert Wood Johnson University Hospital in Somerset, New Jersey, via an ambulance, in which he remained handcuffed to the stretcher.

37. Plaintiff Kaul was rapidly transferred to the emergency room and then onto the cardiac unit, where he was placed on intensive cardiac monitoring, but continued to be handcuffed to the bed and guarded by several prison officers.

38. In the early morning of September 17, 2016, Plaintiff Kaul's then partner, a nurse, paid two thousand dollars ($2,000) to the State of New Jersey towards the alleged child support, without which Plaintiff Kaul would not have been released and would have been returned to jail.

39. Subsequent to the Somerset County Sheriff's Department receiving confirmation of the $2,000 payment, the officers commenced the process to release Plaintiff Kaul, which involved checking as to any outstanding warrants.

40. In the process it was discovered that there was an alleged outstanding warrant from Mercer County, and upon informing Plaintiff Kaul of this alleged warrant and that instead of being released, he would be transferred into the custody of the Mercer County Sheriffs and transported to the Mercer County Correctional Center in Trenton, NJ, for further processing and appearance before a judge.

41. Plaintiff Kaul's physician, who had been markedly disturbed by the events he observed in witnessing a colleague with resistant hypertension chained to a hospital bed, informed the prison guards that the stresses associated with transferring Plaintiff Kaul to Trenton would likely cause him to sustain a lethal myocardial infarction.

42. The Somerset County Sheriffs Office informed the Mercer County Sheriff's Office, who informed the judge, Peter Warshaw, who adjourned the hearing and stated that the court would mail Plaintiff Kaul a notice of the new date.

11

43. At approximately 4:30 pm Plaintiff Kaul departed the hospital with his partner, who had been prevented by the prison guards from seeing Plaintiff Kaul upon either his admission to the emergency room on September 16, 2016, or while chained to the bed in the cardiac unit.

44. Plaintiff Kaul returned to his residence, and continued his prosecution of Kaul v Christie: 16-CV-02364 (K1), undeterred and in fact fortified by the events of the prior days. Plaintiff Kaul submitted a request to the K1 Magistrate Judge, in which he sought a Temporary Restraining Order and Preliminary Injunction against the State of New Jersey (**Exhibit 1**). The petition was ignored.

45. Approximately two (2) weeks later, Plaintiff Kaul received a letter from the Trenton court, in which the hearing date regarding the alleged tax indictment, had been scheduled for mid-October.

46. Upon receiving the letter, Plaintiff Kaul telephoned the prosecutor's office and during a conversation with a Rachel Cook, the assistant prosecutor assigned to the case; Plaintiff Kaul requested he be sent a copy of the entire file pertaining to the alleged indictment, in order that he could review and prepare for the October hearing.

47. The file was never sent and despite several unanswered and unreturned telephone calls/messages, no information was ever sent to Plaintiff Kaul.

48. Without any understanding or knowledge of the basis of the allegations, Plaintiff Kaul sent a letter to the judge, Peter Warshaw, informing him that he would not attend the hearing until he received the requested information, in accordance with his constitutional rights.

49. Plaintiff Kaul received no response from the court or the prosecutor's office, and as of the filing of this Complaint, has not received a copy of the alleged indictment or the materials on which the purportred indictment was based/procured, the reason being that the 'indictment'

was and is a 'Fraud on the Court', a fact that the law required be known or ought to be known by all state/federal law enforcements agencies/persons within the State of New Jersey and the District of New Jersey.

50. From September 2017 to February 2021, Plaintiff Kaul submitted applications to the states of Pennsylvania/New Jersey/New York for medical licenses, and was, as part of the process, subjected to criminal background checks by state/federal authorities, that involved fingerprinting and the checking for any outstanding arrest warrants (**Exhibits 4 + 5**).

51. No outstanding warrants were found, and Plaintiff Kaul passed all criminal background checks.

52. On February 24, 2021, Plaintiff Kaul filed a lawsuit in the United States District Court for the District of Massachusetts (Kaul v Boston Partners: 21-CV-10326) (K11-2), in which Defendant Christie was charged with, amongst other things, racketeering and violating Plaintiff Kaul's human/civil/constitutional rights.

53. On May 26, 2021, Defendant Christie was served with a copy of the Summons/Complaint at his law office in Morristown, New Jersey.

54. On May 27, 2021, in retaliation for having been sued/served, Defendant Christie, in collusion/conspiracy with persons employed by county and state police agencies, did illegally and without warrants, enter Plaintiff Kaul's place of residence/work and seize his person.

55. The events of the 'Kaul Kidnapping Scheme' are memorialized in a letter filed on May 28, 2021, by Plaintiff Kaul in K11-2 (Exhibit ---) and of note is the fact that no warrant from Mercer County was ever produced, because the indictment was fraudulent, which explains why the Morristown police officers deposited my person at the hospital and left the building.

13

56. Despite Defendant Christie's illegal scheme to attempt to harass/intimidate Plaintiff Kaul into ceasing his prosecution of **The Kaul Cases**, which included having local New Jersey police forces harass process servers delivering legal papers to **The Kaul Cases** Defendants and having a New Jersey deputy attorney general threaten Plaintiff Kaul with arrest if he continued the prosecution, Plaintiff Kaul continued the prosecution.

57. From 2012 onwards, **The Kaul Cases** Defendants scheme of public corruption/obstruction of justice has involved the corruption of, amongst others, New Jersey based politicians/judges/prosecutors/police.

58. On June 14, 2023, during a police traffic stop in Morristown, Plaintiff Kaul was informed by Defendant Kevin Murphy and a colleague that there existed a warrant for his arrest from Mercer County, New Jersey.

59. The approximate time from the moment Plaintiff Kaul was stopped to the time he was informed of the warrant was thirty (30) minutes, during which Defendant Murphy/his colleague engaged in conversation with a person/s over the communication system in their car.

60. The conversation was audible to Plaintiff Kaul and involved discussion about the purported Mercer County warrant.

61. When Defendant Murphy/his colleague approached Plaintiff Kaul's car and informed him of the purported Mercer County warrant, Plaintiff Kaul asked if the warrant was related to his child support case, to which Defendant Murphy knowingly misrepresented that it was, when in fact Defendant Murphy knew it pertained to the illegal Mercer County tax indictment.

62. Defendant Murphy knowing that there was no legitimate warrant, did not present Plaintiff Kaul with a copy of the warrant, but instead ordered Plaintiff Kaul to exit the car, which he did.

14

63. Defendant Murphy denied Plaintiff Kaul's request to call his girlfriend to inform her of the ongoing events and that he would not be meeting her.

64. Defendant Murphy, knowing that there was no legitimate warrant, did conduct a public examination of Plaintiff Kaul's person, in the knowledge that the examination was illegal and constituted a violation of Plaintiff Kaul's human/civil/constitutional rights.

65. Defendant Murphy's public examination was purposed to harass/intimidate/humiliate Plaintiff Kaul, with the by-passing of traffic.

66. Defendant Murphy, knowing that his physical apprehension of Plaintiff Kaul's person was illegal, did then further restrain Plaintiff Kaul's person with handcuffs and place him in the back of his car.

67. Defendant Murphy, knowing that there was no legitimate warrant, did then illegally transport Plaintiff Kaul's person to the Morristown Police Station.

68. Defendant Murphy, knowing that there was no legitimate warrant, and seeking to conceal from public view the illegal transport of Plaintiff Kaul, did enter the police station through a small well hidden rear exit, that bypassed the public booking area into which Plaintiff Kaul had been taken on May 27, 2021.

69. The transport of Plaintiff Kaul in this clandestine manner was consistent with Defendant Murphy's guilty state-of-mind, in knowing that there existed no legitimate arrest warrant, and that his illegal seizure of Plaintiff Kaul's person did willfully and knowingly violate Plaintiff Kaul's human/constitutional/civil rights.

70. Defendant Murphy entered a small bay and walked Plaintiff Kaul from the car down a set of bare concrete steps to a door which opened into a small room, which Defendant Murphy and Plaintiff Kaul entered.

71. At no point in time from the seizure of Plaintiff Kaul's person to his transfer to the US Marshals Service did any police officer or person inform him of his rights or of his right to remain silent.

72. An individual by the name of Underhill appeared, and began questioning Plaintiff Kaul.

73. Plaintiff Kaul was photographed, but not fingerprinted and was then instructed to remove his shoes and placed in a cell in which the temperature was excessively low.

74. Plaintiff Kaul was wearing no socks and after what seemed to be approximately two (2) hours in the cell pressed a communication button on the wall and indicated at a wall camera that he required assistance. His requests were ignored.

75. After what Plaintiff Kaul subsequently surmised was approximately four (4) hours, the door opened and Defendant Murphy and his colleague entered, and informed Plaintiff Kaul that he was to be transferred to the Mercer County Correctional Center.

76. Defendant Murphy and his colleague instructed Plaintiff Kaul to 'put his shoes on' and they then handed him into the custody of two individuals wearing badges and shirts on which were emblazoned words indicating they belonged to a "FUGITIVE" task force of the United States Marshals Service.

77. These individuals instructed Plaintiff Kaul to face the wall, and then proceeded to place a shackling system on his person, in which a wide leather band was placed around his waist to

16

which was tethered a set of handcuffs that were placed around Plaintiff Kaul's wrists, while attaching a set of cuffs around Plaintiff Kaul's ankles that restrained the motion of his legs.

78. At no point was Plaintiff Kaul permitted to make a telephone call.

79. Plaintiff Kaul was then walked from this underground area back up the bare concrete steps, and into the back seat of a black car with blacked out windows, in which he was restrained with a harness.

80. Plaintiff Kaul was not provided the names of the two individuals wearing insignia from the United States Marshals Service.

81. Plaintiff Kaul was transported from the Morristown Police Station to the Mercer County Correctional Center, with the car reaching speeds of almost 100 mph, causing a travel time of approximately one (1) hour.

82. Plaintiff Kaul's person was seized by Defendant Murphy at approximately 9:30 am EST, and he was transferred into the Mercer County Correctional Center at approximately 2:30 pm EST.

83. Plaintiff Kaul was led from the black car through a door into a small waiting area in which there was sat an African American male, in which there was a one-way mirror, on the other side of which sat a person and in which there was a TV repeating a video regarding the reporting of prison rape.

84. Still cuffed at the wrists/ankles, Plaintiff Kaul sat on a bench for approximately thirty (30) minutes, and was then instructed by a jail officer to enter a processing area, where the cuffs were removed by one of the United States Marshals, an individual in his fifties with dark hair and approximately five feet ten inches and two hundred pounds.

17

85. As this individual was removing the cuffs, Plaintiff Kaul told him that if he wanted to know who Plaintiff Kaul was that he should go to www.drrichardkaul.com. He repeated this information, and Plaintiff Kaul confirmed its accuracy.

86. Plaintiff Kaul was then moved into another room where he was fingerprinted, placed in prison attire, photographed, and given a blanket, sheet, some slippers, a cup, toothbrush, toothpaste, and deodorant.

87. Plaintiff Kaul was then given directions to the prison cell, it being an enclosed area in which there approximately seventy (75) beds, organized in sets of bunks of three, and in which there were multiple men sleeping on the floor in extremely unhygienic conditions.

88. Plaintiff Kaul's period of illegal detainment was in excess of twenty-four (24) hours.

89. On the morning of Thursday June 15, 2023, at approximately 7 am EST, a person purporting to be a nurse appeared at the cell gates, her appearance was announced by a prison guard and a number of men formed a queue at the gate.

90. Plaintiff Kaul joined this queue, seeking to obtain his blood pressure medications, which he had been prevented from taking the prior day.

91. The purported nurse handed Plaintiff Kaul a small paper cup containing four tablets that did not look like Plaintiff Kaul's usual blood pressure medications.

92. Plaintiff Kaul enquired as to the nature of each tablet, and was informed that the medications were the ones of which he had informed the intake persons.

93. At approximately 9 am EST, the prison guard enquired if Plaintiff Kaul wanted to see the prison psychiatrist, to which he responded in the negative.

18

94. At approximately 11 am EST, Plaintiff Kaul, along with a group of other men were escorted to the floor on which the medical unit was situated, but because the waiting room was full, Plaintiff Kaul was re-directed to the virtual court room, where he believed he would have an exchange with a judge.

95. Plaintiff Kaul entered an area in which there were several small rooms in which there were phones and telecommunications screens.

96. The prison guard instructed Plaintiff Kaul to enter one of the rooms and pick up the phone, which Plaintiff Kaul did, and a conversation then ensued between Plaintiff Kaul and a person who purported to be a representative of the public defenders office, tasked to ascertain whether Plaintiff Kaul qualified for public defender assistance.

97. This female person asked Plaintiff Kaul a series of questions and concluded that Plaintiff Kaul did qualify for a public defender, although Plaintiff Kaul did neither request nor indeed want a public defender, as he intended on representing himself.

98. At the conclusion of the conversation, Plaintiff Kaul was escorted back to the medical unit and entered into the waiting room, where there were sat approximately twenty (20) men.

99. Approximately fifteen (15) minutes after entering the medical unit, there was an incident in which another man, a rather frail/confused one, had thrown an empty paper cup at the prison guard, which resulted in a number of heavily armed men entering the room, violently apprehending this slightly built/confused individual, and instructing all other men to move into the corridor next to the waiting room.

100. Plaintiff Kaul was subsequently called into see a doctor, who knew of Plaintiff Kaul's physician status, and who stated that it was highly unusual for a physician to be held in the medium-maximum security facility that is the Mercer County Correctional Center.

19

101. The physician asked Plaintiff Kaul a series of questions pertaining to suicidal ideation, and enquired as to whether Plaintiff Kaul had considered suicide, to which Plaintiff Kaul answered in the negative.

102. The physician responded that professionals of Plaintiff Kaul's age who find themselves held in medium-maximum security facilities are at a very high risk of suicide, and require mental health evaluations.

103. Plaintiff Kaul expressed that he did not have any suicidal ideation, but the physician recommended Plaintiff Kaul be seen by a mental health evaluator.

104. Plaintiff Kaul was then escorted from the medical unit to the mental health evaluation unit, where he entered a room, in which was sat an individual who purported to be a mental health evaluator.

105. This person enquired if Plaintiff Kaul wanted to make a phone call, to which Plaintiff Kaul responded in the affirmative and stated that he wanted to call his lawyer, as he had not been permitted to speak to a lawyer since his arrest by Defendant Murphy.

106. This person stated that Plaintiff Kaul was not permitted to call a lawyer and could only call a **"loved one"**, which Plaintiff Kaul did, and during which he quickly instructed his friend to call Plaintiff Kaul's lawyer.

107. Plaintiff Kaul was then escorted back to the cell area, but approximately thirty (30) minutes later, he was escorted back to the medical unit, where he saw a nurse who presented him with a paper cup containing a large tablet of Librium.

108. Plaintiff Kaul enquired as to why he was being prescribed an anti-psychotic medication that causes mental infirmity in otherwise healthy individuals, to which the evidently nervous nurse answered that it was to mitigate Plaintiff Kaul's symptoms of withdrawal.

20

109. Plaintiff Kaul stated that he was not experiencing withdrawal from opiate narcotics, as he had never taken any, and did not require a medication such as Librium.

110. The nurse informed Plaintiff Kaul that she had been instructed to have Plaintiff Kaul consume the Librium.

111. Plaintiff Kaul placed the tablet in his mouth, but under his tongue, swallowed some water, and upon re-entering the cell, went to the bathroom area and spat the tablet into the toilet.

112. The nervous nurse failed to inspect Plaintiff Kaul's mouth after he had deposited the tablet.

113. The nervous nurse also, quite accidentally, informed Plaintiff Kaul that he was to be held in the facility for at least thirty (30) days.

114. It became rapidly apparent to Plaintiff Kaul that Defendant Christie's scheme was to have Plaintiff Kaul rendered/labelled mentally incompetent, in order to subsequently use the label against him in Plaintiff Kaul's prosecution of **The Kaul Cases** and his efforts to have his NJ license reinstated and or procure licenses in other states/countries.

115. It also became apparent to Plaintiff Kaul that Defendant Christie's scheme involved attempting to have Plaintiff Kaul held for as long as possible, with the intention of having him, while in a mentally incapacitated state, physically injured/killed, in order to prevent him from continuing his prosecution of **The Kaul Cases** by his elimination through either death or severe physical/psychological injury.

116. At approximately 7:30 pm, more than twenty-four (24) hours since the illegal seizure of Plaintiff Kaul's person by Defendant Murphy and without having seen a judge, Plaintiff Kaul was instructed by a prison guard that he was to immediately depart the facility.

21

117. Plaintiff Kaul was provided no documentation regarding any subsequent legal proceedings pertaining to the fraudulent tax indictment, but was given copies of the traffic tickets from Defendant Murphy, that were issued on June 14, 2023, during and as part of his knowingly illegal seizure of Plaintiff Kaul's person.

118. Plaintiff Kaul was transported from the Mercer County Correctional Center to the center of Trenton, where he was disembarked from the prison van at approximately 9:30 pm.

119. Plaintiff Kaul arrived at his residence at approximately 12:30 am June 16, 2023.

## Legal Claims

### 42 U.S.C. § 1983 – CIVIL ACTION FOR DEPRIVATION OF RIGHTS

120. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

### COUNT ONE
### AGAINST DEFENDANTS CHRISTIE/MURPHY

### VIOLATION OF PLAINTIFF KAUL'S DUE PROCESS RIGHTS PURSUANT TO THE FIFTH, EIGHT AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

121. Plaintiff Kaul incorporates all of the above facts as if re-pled.

122. Defendant Christie, in causing the filing in May 2016 of a knowingly false tax indictment/legal instrument, did, while occupying the Office of the New Jersey Governor, knowingly and with malice, abuse the power of state as a 'state actor'.

23

123. Defendant Christie, as a 'state actor' did act under color of law in knowing violation of the law and of Plaintiff Kaul's human/constitutional/civil rights.

124. Defendant Christie, as a 'state actor' in knowingly violating the law and Plaintiff Kaul's human/constitutional/civil rights for the purpose of having filed a false criminal charge against Plaintiff Kaul, did knowingly commit a 'Fraud on the Court'.

125. Defendant Christie's commission of crime was committed against Plaintiff Kaul, to whom he caused and continues to cause irreparable injury and insult.

126. Defendant Christie's commission of crime was committed against the process of justice to which he caused and continues to cause irreparable injury and insult.

127. Defendant Christie's commission of crime was committed against the Office of the New Jersey Governor, to which he caused and continues to cause irreparable injury and insult.

128. Defendant Christie's commission of crime was committed against the Office of the New Jersey Attorney General, to which he caused and continues to cause irreparable injury and insult.

129. Defendant Christie's commission of crime was committed against the public, to which he caused and continues to cause irreparable injury and insult.

130. Defendant Christie's commission of crime was motivated by his political ambition to become the 2016 US President.

131. Defendant Christie, in the commission of crime/violation of civil rights, did know he was a 'state actor' engaging in a knowingly illegal conspiracy with other 'state actors' within the Office of the New Jersey Attorney General.

132. Defendant Christie, in the commission of crime/violation of civil rights, did know he was a 'state actor' engaging in a knowingly illegal use of the US wires.

133. Defendant Christie's willful/knowing/malicious deprivation of Plaintiff Kaul's human/constitutional/civil rights caused and continues to cause injury to Plaintiff Kaul, and as such Defendant Christie remains liable to Plaintiff Kaul for compensatory, consequential, and punitive damages.

134. Defendant Murphy, in acting with a knowledge of the illegality of the warrant on June 14, 2023, did so in his capacity as a 'state actor' pursuant to a section 1983 claim.

135. Defendant Murphy, in the knowledge that the warrant was illegal, did, while acting under color of law, knowingly violate Plaintiff Kaul's human/constitutional/civil rights.

136. Defendant Murphy' knowing violation of Plaintiff Kaul's human/constitutional/civil rights were committed through the illegal arrest, imprisonment, and denial of Plaintiff Kaul's request to alert a third party of his whereabouts.

137. Defendant Murphy's illegal seizure of Plaintiff Kaul's person and violation of his rights, while a 'state actor' acting under color of law, has caused him to incur liability pursuant to section 1983.

138. Defendant Murphy, an employee of the Morristown Police Department, did know of the illegal seizure of Plaintiff Kaul's person on May 27,2021.

139. Defendant Murphy, in the knowledge of the illegality of the May 27, 2021, seizure, the illegality of the warrant and the illegality of the June 14, 2023, seizure, did nonetheless commit these violations of law and Plaintiff Kaul's rights, as he had received orders to do so.

**COUNT TWO**

AGAINST DEFENDANTS CHRISTIE/MURPHY

## VIOLATION OF PLAINTIFF KAUL'S RIGHT PURSUANT TO THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION

140. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

141. The conspiracy underpinning, surrounding, and causing the issuance in May 2016 of a fraudulent tax indictment, the illegal seizure of Plaintiff Kaul's person on May 27, 2021, and the illegal seizure of Plaintiff Kaul's person on June 14, 2023, does, pursuant to the doctrine of vicarious liability (SEDIMA, S. P. R. L. v. IMREX CO., INC., ET AL. No. 84-648. 473 U.S. 479 (1985) confer on Defendant Christie the liability of Defendant Murphy's illegal seizure of Plaintiff Kaul, as if Defendant Christie conducted the illegal seizure himself.

142. Defendant Murphy's June 14, 2023, illegal seizure of Plaintiff Kaul's person, although conducted with a knowing illegality, would never have occurred had Defendant Christie not had issued the May 2016 fraudulent tax indictment.

143. The law prohibits Defendant Murphy from raising a probable cause defense. See Berg v County of Allegheny, 219 F. 3d 261 – Court of Appeals, 3rd Circuit 2000 (**Exhibit 3**):

144. "The Supreme Court's decision in *Whiteley v. Warden,* **401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971),** as well as our own subsequent decisions, make clear that an erroneously issued warrant cannot provide probable cause for an arrest. In *Whiteley,* a county sheriff obtained a warrant for Whiteley's arrest based on a conclusory complaint. Police officers in

another jurisdiction arrested Whiteley, discovering evidence later introduced at his trial. The state argued that because the arresting officers were unaware of the defect in the warrant, they had probable cause to arrest whether or not the sheriff did. But the Supreme Court held that the arrest was unconstitutional and ordered the evidence excluded:

Certainly, police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." at 270

145. Neither can Defendant Murphy claim the "I was only taking orders" defense, a defense debunked at the Nuremberg Trials.

146. Defendant Murphy's illegal seizure of Plaintiff Kaul was made without probable cause, as Defendant Murphy knew the tax indictment related warrant was illegal, but for reasons of professional advancement entered into the conspiracy formed on May 26/27, 2021, between Defendant Christie and the Morristown Police Department.

147. Further substantiating Defendant Murphy's defenseless position is the fact that he, upon communicating with persons at the Morristown Police Department, knew that the May 27, 2021, seizure of Plaintiff Kaul's person was illegal

148. Further substantiating Defendant Murphy's defenselessness is the fact that he, upon communicating with persons at the Morristown Police Department, knew that the illegal May 27, 2021, seizure of Plaintiff Kaul's person was a retaliatory act initiated/orchestrated by Defendant Christie in an attempt to harass/intimidate/injure/kill Plaintiff Kaul, in order to cause him to cease his prosecution of **The Kaul Cases** Defendants.

27

149. Defendant Murphy, with this information in mind, knew that the law prohibited him from seizing Plaintiff Kaul's person, and thus he is without any defense as to his knowingly illegal seizure of Plaintiff Kaul's person.

## COUNT THREE
## AGAINST DEFENDANTS CHRISTIE/MURPHY

### 42 U.S.C. § 1985 (3) – CONSPIRACY TO INTERFER WITH CIVIL RIGHTS

150. "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

151. The conspiracy that commenced against Plaintiff Kaul did so in approximately 2005/2006, when Plaintiff Kaul invented and successfully performed the first percutaneous minimally invasive outpatient spinal fusion.

28

152. From 2005/2206 this conspiracy has expanded to include, amongst others, the Morristown Police Department, which did knowingly enter the conspiracy on May 26/27, 2021, upon the encouragement by Defendant Christie of senior persons within the department.

153. Within the conspiracy there was an agreement, both tacit and explicit, that the successful execution of the scheme to eliminate Plaintiff Kaul (jail/suicide/murder) would require his civil rights be violated.

154. Defendants Christie and his co-conspirators at the Morristown Police Department knew that the willful violation of Plaintiff Kaul's civil rights constituted a felony, but did nonetheless attempt to perpetrate the scheme in the belief that Plaintiff Kaul would be eliminated on May 27, 2021, by having him transferred to the Mercer County Correctional Center, where he was to be seriously injured/killed, in order to render him unable to continue his prosecution of **The Kaul Cases**.

155. The conspiracy to violate Plaintiff Kaul's civil rights continued from the Morristown Police Department to the United States Marshals Service and into the Mercer County Correctional Center, where the scheme, for which Defendants Christie/Murphy, and in fact all of **The Kaul Cases** Defendants, pursuant to RICO's vicarious liability doctrine, are liable, involved an attempt to use anti-psychotics to render Plaintiff Kaul mentally infirm, psychiatrically labelled, susceptible to serious injury/death, in order to effectively eliminate his right to life and to actually eliminate Plaintiff Kaul.

156. It has become all but impossible to place a lead bullet in Plaintiff Kaul's head (that opportunity was lost in 2021) and so the schemes now involve pharmacological bullets.

# Relief

1. Injunctive relief prohibiting any persons/agencies that either are or ever have been associated/contracted/employed/otherwise related to any legal elements/agencies of the State of New Jersey/its counties and or their agents from any further attempts at harassment/intimidation/interference with the person and rights of Plaintiff Kaul.

2. Compensatory/Consequential/Punitive relief in the amount of five hundred million dollars ($ 500,000,000).

3. An order to Defendant Christie that he is to disseminate to all state agencies/courts/judges the above judgments.

## Conclusion

K11-15 represents an unhinged escalation of force that constitutes further conclusive evidence of the guilt of **The Kaul Cases** Defendants, to a criminal standard. This evidence will be submitted into K11-14 in support of motions for Summary Judgment.

The State of New Jersey is a Defendant in K11-5 (India), and the Indian Government is now appraised of the events/facts of this case and others.

Plaintiff Kaul respectfully informs this Court that its inaction in October 2016 regarding Plaintiff Kaul's request for a TRO/PI and subsequent obstruction of Plaintiff Kaul's efforts at prosecuting **The Kaul Cases** are partially responsible for the events of May 27, 2021/June 14, 2023, and should Plaintiff Kaul be injured/'suicided'/murdered, the Indian Government will demand **The Kaul Cases** Defendants be brought to justice in the US, and will exercise its power over American citizens/corporations in India.

Dated: June 27, 2023

_____

RICHARD ARJUN KAUL, MD

31



RICHARD KAUL
(973) 876-2877
24 WASHINGTON VALLEY RD
MORRISTOWN  NJ 07960

1 LBS          1 OF 1
SHP WT: 1 LBS
DATE: 06 JUL 2023

SHIP  HONORABLE BETH BLOOM
TO:  UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
301 N MIAMI AVE

MIAMI  FL 33128-7702

FL 330 6-03

UPS GROUND
TRACKING #: 1Z X24 411 03 4400 5665

BILLING: P/P

REF #1: EP

